| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY<br>**Caption in Compliance with D.N.J. LBR 9004-1(b)**<br>**PORZIO, BROMBERG & NEWMAN, P.C.**<br>100 Southgate Parkway<br>Morristown, New Jersey 07962<br>(973) 538-4006<br>(973) 538-5146 Facsimile<br>Kelly D. Curtin (kdcurtin@pbnlaw.com)<br>Christopher P. Mazza (cpmazza@pbnlaw.com)<br><br>*Counsel to the Estate of Bryan Massoud* | |
| In re:<br><br>HAJJAR BUSINESS HOLDINGS, LLC, *ET AL*,[1]<br><br>Debtors. | Chapter: 11<br><br>Case No.: 20-12465 (JKS)<br>(Jointly Administered)<br><br>**Hearing Date and Time:**<br>**March 29, 2022 at 10:00 a.m.** |

## THE ESTATE OF BRYAN MASSOUD'S (I) JOINDER TO THE PETERSON OBJECTION TO JOINT DEBTORS' DISCLOSURE STATEMENT AND (II) OBJECTION TO JOINT DEBTORS' DISCLOSURE STATEMENT

The Estate of Bryan Massoud (the "Massoud Estate") by and through its undersigned attorneys, submits this joinder to *Creditors/Interested Parties John C. Peterson, O.A. Peterson Construction Co., Inc., Jaecals I, LLC, Jaecals II, LLC, and Jaecals III, LLC Objection to Joint*

---

[1] The debtors in these cases are: HMOB of Jersey City Owner, LLC, Case No. 20-12557-JKS; Hajjar Medical Office Building of Jersey City, LLC, Case No. 20-12472-JKS; HMOB of Wayne Owner, LLC, Case No. 20-12550-JKS; Hajjar Medical Office Building of Wayne, LLC, Case No. 20-12464-JKS; HMOB of Roseland Owner, LLC, Case No. 20-12552-JKS; Hajjar Medical Office Building of Roseland, LLC, Case No. 20-12466-JKS; HMOB of New Brunswick Owner, LLC, Case No. 20-12549-JKS; Hajjar Medical Office Building of New Brunswick, LLC, Case No. 20-12476-JKS; HMOB of Oradell Owner, LLC, Case No. 20-12551-JKS; Hajjar Medical Office Building, LLC, Case No. 20-12470-JKS; HMOB of Carlstadt Owner, LLC, Case No. 20-12553-JKS; Hajjar Medical Office Building of Carlstadt, LLC, Case No. 20-12467-JKS; HMOB of Hackensack Office Owner, LLC, Case No. 20-12555-JKS; Hajjar Medical Office Building of Hackensack, LLC, Case No. 20-12471-JKS; HMOB of Hackensack Warehouse Owner, LLC, Case No. 20-12556-JKS; Hajjar Warehouse of Hackensack, LLC, Case No. 20-12473-JKS; HMOB of Fair Lawn Owner, LLC, Case No. 20-12547-JKS; Hajjar Medical Office Building of Fairlawn, LLC, Case No. 20-12468-JKS; HMOB of Glen Rock Owner, LLC, Case No. 20-12545-JKS; Hajjar Medical Office Building of Glen Rock, LLC, Case No. 20-12469-JKS; HMOB of Fair Lawn 15-01 Broadway Owner, LLC, Case No. 20-12536-JKS; Hajjar Business Holdings, LLC, Case No. 20-12465-JKS; HMOB of Mt. Kisco Owner, LLC, Case No. 20-12540-JKS; Hajjar Medical Office Building of Mount Kisco, LLC, Case No. 20-12474-JKS; HMOB of Miramar Owner, LLC, Case No. 20-12543-JKS; and Hajjar Medical Office Building of Miramar, LLC, Case No. 20-12475-JKS.

1

*Debtors' Disclosure Statement* [ECF No. 983] (the "Peterson Objection") and the Massoud Estate's further objection (collectively, the "Objection") to the adequacy of the Joint Debtors' Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code [ECF No. 926] (the "Disclosure Statement") Describing Joint Chapter 11 Plan of Reorganization Proposed by the Debtors-in-Possession [Doc. 927] (the "Plan") and, together with relying on the *Certification of Maria P. Dermatis* (the "Dermatis Cert.") in support of this Objection submitted herewith, respectfully states as follows:

## PRELIMINARY STATEMENT

1.  The Debtors' proposed Disclosure Statement cannot be approved by the Court in its current form because it lacks adequate information that would enable a hypothetical investor of the relevant class to make an informed judgment about the Plan as is required by Section 1125 of Bankruptcy Code.  The Massoud Estate is a 30% owner of the Debtor Hajjar Medical Office Building of Fair Lawn Limited Liability Company ("Hajjar Fair Lawn").  However, the Disclosure Statement provides no information to holders of equity in Hajjar Fair Lawn or any of the "Operating Debtors"[2] as to the treatment of their claims.[3]  In fact, the only mention of any equity class in the Disclosure Statement is of John H. Hajjar ("Hajjar"), who is "retaining his equity interest." *Disclosure Statement* at §IV(C)(4).  Accordingly, other equity holders are left to wonder how their claims will be treated—if at all[4]—by the Debtors, all while faced with a Disclosure Statement and Plan that conveniently ignore the Debtors' ownership structure, strip away any value

---

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Disclosure Statement and Plan.
[3] Indeed, the Disclosure Statement refers to the Massoud Estate in its "Background" section, but never addresses how its claims will be treated.  See Disclosure Statement at §II(A), pp. 12-13.
[4] The Disclosure Statement makes reference that the other cases may be dismissed or converted. See Disclosure Statement at §I, n. 5.

2

for the benefit of Hajjar only, and release the Owner Debtors, Hajjar, and a variety of third parties. *Disclosure Statement* at §§I, n. 5, and VI(B).

2. The Disclosure Statement also lacks adequate information on a number of other topics, as more fully set forth in the Peterson Objection. Such topics include, *inter alia*, (i) impermissible releases of third parties, particularly of Hajjar, who is contributing nothing to the reorganization process but is being granted a broad release together with the real property subject to the Plan; (ii) description of criminal investigations and proceedings against Hajjar, and the risk that they may unwind the provisions of the Plan; (iii) why the Debtors' have the ability to profitably manage the real properties when the problems that caused the mismanagement of those properties and preceded the filing of these bankruptcy cases remains present; (iv) nothing more than a footnote that the properties, if successfully refinanced resulting in a payoff to the Secured Lender, may be conveyed to a "nominee" designated by Hajjar, which "may include but is not limited to a Hajjar family trust and/or a related or affiliated entity"; (v) inadequate information related to the allocation of refinance proceeds to the real properties consistent with the documents evidencing the Nataxis Loan; and (iv) wholly conclusory statements related to the value of the real properties without any market analysis or appraisals, such that a hypothetical investor of the relevant class cannot properly evaluate the Debtors' proposed liquidation analysis and/or feasibility analysis.

3. Without significant revisions to the documents, these shortfalls in the Disclosure Statement and Plan not only equate to inadequate information such that the Disclosure Statement cannot be approved, but also represent a patently unconfirmable Plan that should be denied at the Disclosure Statement stage.

6762850

**RELEVANT BACKGROUND**

4.  Dr. Bryan J. Massoud ("Dr. Massoud") was a renowned orthopedic and spinal surgeon. Dr. Massoud tragically lost his battle to cancer, and passed away in January 2020. Dr. Massoud was a member of, and equity holder in, a number of the Debtors[5] in these bankruptcy cases. The Massoud Estate is the successor in interest to Dr. Massoud.

5.  On or about May 22, 2009, the Debtor Hajjar Medical Office Building of Fair Lawn Limited Liability Company ("Hajjar Fair Lawn") was formed. *See* Dermatis Cert. at ¶3, Exhibit A.

6.  On or about June 24, 2009, a deed dated May 29, 2009 was recorded with the Bergen County Clerk, evidencing Hajjar Fair Lawn's ownership of the property commonly known as 14-01 Broadway, Fair Lawn, New Jersey 07410 (the "Fair Lawn Property"). The Fair Lawn Property is two-story multi-tenant medical office building. *See* Dermatis Cert. at ¶6, Exhibit D.

7.  On or about July 5, 2012, Dr. Massoud and Hajjar executed that certain *Operating Agreement of Hajjar Medical Office Building of Fair Lawn Limited Liability Company* (the "Operating Agreement") whereby Dr. Massoud was granted a thirty percent (30%) interest in Hajjar Fair Lawn and Hajjar was granted a fifty percent (50%) interest in Hajjar Fair Lawn. Drs. John Lee Berger and Andranik Howhannesian were also each granted ten percent (10%) ownership interests in Hajjar Fair Lawn. *See* Dermatis Cert. at ¶7, Exhibit E.

8.  Hajjar Fair Lawn's sole asset was the Fair Lawn Property.

9.  The Operating Agreement appointed Hajjar manager of Hajjar Fair Lawn, and provided him with certain abilities. However, certain actions were restricted to requiring a supermajority vote of seventy per cent (70%) or more of the membership interests. Such actions

---

[5] Notably, Dr. Massoud was a holder of 30% equity in Hajjar Medical Office Building of Fair Lawn Limited Liability Company. Dr. Massoud also held a 25% interest in Hajjar Medical Office Building of Glen Rock Limited Liability Company through Mass Realty LLC, of which Dr. Massoud was the 100% owner and sole member. Accordingly, Dr. Massoud owns equity in the wholly owned subsidiaries of those entities he has a direct equity interest in.

4

include, but are not limited to, (i) filing a bankruptcy petition; (ii) creating any subsidiary of Hajjar Fair Lawn; (iii) dissolving Hajjar Fair Lawn; and (iv) creating a lien on any property owned by Hajjar Fair Lawn, e.g., mortgaging any of the property owned by Hajjar Fair Lawn. *See* Operating Agreement at Article 5.1.2. Furthermore, "any single Member owning fifty percent (50%) or less of the Percentages then held by all Members, shall not have the authority to bind the Company." *Id.* at Article 5.1.3.

10. On or about October 22, 2015, Hajjar formed HMOB of Fair Lawn Mezz, LLC ("Fair Lawn Mezz") in Delaware. *See* Dermatis Cert. at ¶4, Exhibit B.

11. On or about October 22, 2015, Hajjar formed HMOB of Fair Lawn Owner, LLC ("Fair Lawn Owner") in Delaware. *Id*. at ¶5, Exhibit C.

12. Upon information and belief, both Fair Lawn Mezz and Fair Lawn Owner are unauthorized subsidiaries of Hajjar Fair Lawn, and were formed in violation of the Operating Agreement.

13. Hajjar Fair Lawn, of which the Massoud Estate has a 30% equity interest, is the 100% owner of Fair Lawn Mezz, which in turn is the 100% owner of Fair Lawn Owner. *See* Disclosure Statement §II(A), at pp. 12-13. Accordingly, the Massoud Estate has a 30% equity interest in Fair Lawn Mezz as well as Fair Lawn Owner.

14. On or about April 22, 2016, Cushman & Wakefield appraised the Fair Lawn Property at $6,500,000. *Id.* at ¶48.

15. On or about April 29, 2016, Hajjar, as the sole signatory for Hajjar Fair Lawn, executed a deed conveying the Fair Lawn Property to Fair Lawn Owner for ten dollars ($10), despite having been appraised at $6,500,000 a week earlier. The deed evidencing this transaction was

6762850

subsequently recorded with the Bergen County Clerk on May 23, 2016. *See* Dermatis Cert. at ¶8, Exhibit F.

16. On or about April 29, 2016, Fair Lawn Owner,[6] enters into a loan agreement with Nataxis Real Estate Capital LLC ("Nataxis") for $81,500,000 (the "Nataxis Agreement"). *Id.* at ¶9, Exhibit G. Hajjar, without the signatures of any other Hajjar Fair Lawn members, signs the Nataxis Agreement whereby the Fair Lawn Property in which Dr. Massoud had a 30% equity interest was mortgaged to Nataxis in violation of the Operating Agreement's provisions. *Id.*

17. The Nataxis Agreement clearly shows Dr. Massoud's 30% ownership interest. *Id.*, Exhibit G at §4.17 and Schedule 3. The Nataxis Agreement also states that, of the total aggregate amount of the $81,500,000 loan, only $4,784,795[7] was being allocated to the Fair Lawn Property. *Id.*, Exhibit G at Schedule 5.

18. Furthermore, Hajjar made several material misrepresentations in the Nataxis Agreement, including that Fair Lawn Mezz and Fair Lawn Owner were validly-existing subsidiaries of Hajjar Fair Lawn with the power to make the collateral pledges asserted in the Nataxis Agreement.

19. On or about April 29, 2016, Hajjar caused Fair Lawn Mezz,[8] to enter another loan agreement with Nataxis for $10,000,000 (the "Nataxis Mezz Agreement"). The Nataxis Mezz Agreement purports to pledge all of Fair Lawn Mezz's membership interests in Fair Lawn Owner to Nataxis, all without the consent of Dr. Massoud, and purportedly creates a lien on an asset of Hajjar Fair Lawn in violation of the Operating Agreement. *See* Dermatis Cert. at ¶10, Exhibit H.

---

[6] Which is an unauthorized wholly owned subsidiary of Fair Lawn Mezz, which is an unauthorized wholly owned subsidiary of Hajjar Fair Lawn of which Dr. Massoud owns a 30% equity interest.
[7] This is significant insofar as it demonstrates that there is equity in the Fair Lawn Property given the $6,500,000 appraisal.
[8] Which is an unauthorized wholly owned subsidiary of Hajjar Fair Lawn of which Dr. Massoud has a 30% equity interest.

6762850

20. The formation of the Fair Lawn Mezz and Fair Lawn Owner entities in October 2015, together with the transfer of the Fair Lawn Property, refinancing of the Fair Lawn Property through the Nataxis Agreement and the Nataxis Mezz Agreement, and the subsequent continuous misappropriation of funds by Hajjar and Hajjar-controlled entities is consistent with the allegations set forth in the Peterson Objection. *See* Peterson Objection at ¶¶11-26.

21. Notwithstanding the dearth of information contained in the Disclosure Statement to allow a hypothetical investor to understand and informatively vote on the Plan, the Disclosure Statement and proposed Plan attempt to bypass all of these unauthorized acts by Hajjar and his companies, inappropriately erase any equity held by victims of Hajjar's schemes, and provide a fresh start to Hajjar—who will be receiving various impermissible releases as well as the properties at the center of these chapter 11 cases free and clear of any other equity interests—presumably to embark on his next endeavor while no other interested parties receive any value.

## OBJECTION

### A. The Disclosure Statement Fails to Provide Adequate Information Pursuant to 11 U.S.C. § 1125(b)

22. Section 1125(b) mandates the filing of a disclosure statement containing "adequate information." 11 U.S.C. § 1125(b). Section 1125(a) defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor … that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan…" 11 U.S.C. § 1125(a). The determination as to whether a disclosure statement includes "adequate information" is determined on a case-by-case basis. *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988). As the Third Circuit has recognized, a debtor's obligation to provide sufficient data to satisfy the Section 1125 standard of adequate information "cannot [be]

overemphasiz[ed]," as "the importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court." *Id.*

23. Although courts assess adequacy on a case-by-case basis, a disclosure statement must contain, at a minimum, "simple and clear language delineating consequences of the proposed plan on [creditors'] claims and the possible . . . alternatives so that [creditors] can intelligently accept or reject the Plan." *In re Copy Crafters Quickprint, Inc.,* 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988); *see also Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.,* 337 F.3d 314, 322 (3d Cir. 2003) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information."). In essence, a disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti,* 128 B.R. 16, 19 (Bankr. D.N.H. 1991); *see also See Century Glove, Inc. v. First Am. Bank,* 860 F.2d 94 (3d Cir. 1988) (noting the purpose of the "adequate information" requirement is to help creditors in their negotiations with the debtor over the plan).

24. The Disclosure Statement submitted by the joint Debtors in this case is woefully inadequate and fails to meet these standards in a number of respects.

    i. <u>The Disclosure Statement Fails to Provide Adequate Information Related to Existing Equity Interests</u>

25. The Disclosure Statement not only fails to address existing equity interests entirely, but is inconsistent in even setting forth the equity interests that exist.

26. The Debtors clearly describe Dr. Massoud's 30% equity interest in Hajjar Fair Lawn (*see* Disclosure Statement §II(A), at pp. 12-13), but when it comes to describing the treatment of

the different classes of claims, the Disclosure Statement only states "[Hajjar] will be retaining his equity interest." *Id.* at §IV(C)(4). Despite failing to address the treatment of Dr. Massoud's equity interest—as well as other equity holders—the Debtors' sole statement about treatment of equity is misleading, as Hajjar himself does not hold equity in any of the Debtors; rather his various entities such as non-Debtor B&B Hajjar Investments, LLC are the true holders of Hajjar's equity.

27. Additionally, the Disclosure Statement describes a circuitous and confusing process whereby the "Remaining Properties" are transferred to a Plan Administrator upon confirmation of the Plan[9] and, if the reorganized Debtors ultimately comply with the Forbearance Agreement, the Remaining Properties shall be conveyed back, free and clear of Liens of any kind, to the "Owner Debtors or a nominee to be named by the Owner Debtors," "[s]uch nominee may include but is not limited to a Hajjar family trust and/or a related or affiliate entity." *See* Disclosure Statement at §§III(B)(4)(17) and IV(D).

28. As stated in the Peterson Objection, because the Plan allows such a nominee "to pay the Payoff Amount and take title to the Properties, [Dr. Massoud's] interests in the [Fair Lawn Property] are subject to extinguishment without any consideration." Furthermore, if the proposed release provisions contained in the Disclosure Statement and Plan are approved, it "would allow Hajjar and his entities to escape all liability to [Dr. Massoud]. This is not an equitable result and would condone all of Hajjar improper actions." *See* Peterson Objection at ¶43.

---

[9] It should also be noted that the transfer to the Plan Administrator shall be "free and clear of Liens, claims and encumbrances, with the exception of the Secured Creditor's Claim and the Liens associated therewith pursuant to the terms of this Plan." *Plan*, at §II(F)(2). This may also be an attempt to strip off Dr. Massoud's equity interest, but is ambiguously buried in defined terms and unclear language.

9

B. **The Massoud Estate's Further Objections and Joinder to Remaining Peterson Objections**

29. The Massoud Estate hereby joins in the remaining objections as set forth in the Peterson Objection for the reasons set forth therein, as well as the below objections that do not appear in the Peterson Objection. Such objections include, *inter alia*, that:

- the Disclosure Statement does not provide adequate information related to:

    (i) rental income and the reorganized Debtors' financial ability to abide by the terms of the Forbearance Agreement, including the monthly Forbearance Payments which the Debtors do not accurately describe and a reader is instead forced to reference exhibits attached to the Disclosure Statement and Plan to determine the reorganized Debtors will be responsible for remitting monthly payments of $341,482.41 to the Secured Creditor;

    (ii) the criminal investigation of Hajjar and the effect an indictment or complaint filed in federal court against Hajjar, or a conviction of Hajjar would have on the proposed Plan;

    (iii) the steps taken to remedy the issues that preceded the bankruptcy filing, including a purported "streamline of expenses" (Disclosure Statement at §III(B)(2));

    (iv) the applicable interest rates of documents not attached to the Disclosure Statement or Plan;

    (v) the circumstances under which the Remaining Properties would be transferred to a nominee, and why such an arrangement would be appropriate;

10

    (vi) any appraisals or valuations of the properties, including the Fair Lawn Property, or an allocation of sale proceeds to said properties such as is contained in the Nataxis Agreement, that would allow a hypothetical investor the capability to reasonably scrutinize the liquidation analysis;

    (vii) the treatment of the Operating Debtors after their members have been stripped of all equity interests, and presumably converted to Chapter 7 cases or dismissed, despite the Disclosure Statement and Plan requiring the Operating Debtors to release claims they may have against other parties, including the Owner Debtors;

    (viii) the appropriateness of allowing Regent to continue post-confirmation management of the Debtors despite Regent's historical mismanagement of the Debtors; and

    (ix) the feasibility of the Plan.

- the Disclosure Statement and Plan are patently unconfirmable because they provide for impermissible releases of third parties, without any consideration being contributed by those parties.

**RESERVATION OF RIGHTS**

  30. To the extent any objection, in whole or in part, contained herein is deemed to be an objection to confirmation of the Plan rather than, or in addition to, an objection to the adequacy of the Disclosure Statement, the Massoud Estate reserves the right to assert such objection, as well as any other objections, to confirmation of the Plan. Furthermore, to the extent the Massoud Estate is impacted in any way by the contents of any supplements or amendments to the Disclosure Statement

6762850

or the Plan, which may be filed after any Disclosure Statement or Plan confirmation objection deadline, the Massoud Estate reserves the rights to object thereto.

## CONCLUSION

For the reasons set forth above, the Massoud Estate asks this Court to deny Debtors' Motion (thereby denying approval of the Disclosure Statement) unless and until the Disclosure Statement is significantly modified in accordance with, and satisfaction of, the deficiencies raised herein, and grant such additional relief as is just and proper.

Dated: March 21, 2022

**PORZIO, BROMBERG & NEWMAN, P.C.**

By:  */s/ Christopher P. Mazza*
Kelly D. Curtin, Esq.
Christopher P. Mazza, Esq.
100 Southgate Parkway
P.O. Box 1997
Morristown, New Jersey 07962
Telephone: (973) 538-4006
Facsimile: (973) 538-5146
Email: kdcurtin@pbnlaw.com
cpmazza@pbnlaw.com

*Counsel to the Estate of Bryan Massoud*